## COMMONWEALTH *vs.* CARLOS MARRERO.

No. 01-P-9.

Hampden. May 14, 2003. - December 29, 2003.

Present: MASON, BERRY, & KAFKER, JJ.

*Assault and Battery by Means of a Dangerous Weapon. Firearms. Evidence,* Hearsay, Declaration against interest. *Practice, Criminal,* Hearsay, Assistance of counsel, Argument by prosecutor.

This court concluded that where only discrete references embedded in a declarant's broader out-of-court narrative statement were self-incriminatory and against the declarant's penal interest, such references did not transform the entire narrative into a hearsay-excepted statement against penal interest, and the judge at a criminal trial properly parsed the full narrative statement to determine whether any severable incriminatory parts qualified as declarations adverse to penal interests [228-231]; moreover, because that statement was inadmissible hearsay, and because six other potentially exculpatory statements were also hearsay that did not qualify as excited utterances or prior inconsistent statements, the defendant's counsel was not ineffective for failing to move for the introduction of those statements [231].

At a criminal trial, the judge erred in admitting in evidence a State trooper's statement that "many other people" had given information that the defendant was involved in the crime at issue, but the statement did not pose a substantial risk of a miscarriage of justice, where the reference was fleeting and of minimal impact in the context of a lengthy trial, and where the evidence against the defendant was strong. [231-232]

At a criminal trial, the prosecutor improperly referred in closing argument to the "law of the jungle," but the remark did not give rise to a substantial risk of a miscarriage of justice, where the judge gave a series of limiting instructions both throughout the course of the trial and at its close, and where the evidence proving the defendant's guilt was strong. [232-234]

INDICTMENTS found and returned in the Superior Court Department on August 11, 1998.

The cases were tried before *Constance M. Sweeney*, J., and a motion for a new trial, filed on June 11, 2001, was heard by her.

*Richard J. Fallon* for the defendant.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

BERRY, J. This is a consolidated appeal from the defendant's convictions on two indictments for assault and battery by means of a dangerous weapon and one indictment for unlawful possession of a firearm, and from the denial of a motion for new trial. The guilty verdicts were returned in connection with a drive-by shooting involving rival gangs.

1. *The appellate issues.* The principal issue we address arising out of the denial of the motion for a new trial involves the reach of the hearsay exception for statements against a declarant's penal interest, where only a part or parts of a broader narrative statement are self-incriminatory to the declarant. Consistent with the analysis of segmented admissibility adopted for Fed.R.Evid. 804(b)(3) in *Williamson* v. *United States,* 512 U.S. 594 (1994), we hold that where only discrete references — albeit embedded in a broader out-of-court narrative statement — are self-incriminatory and against the declarant's penal interest, such references do not transform the entire narrative into a hearsay-excepted statement against penal interest. Rather, the trial judge, as was appropriately done in this case, should parse the full narrative statement to determine whether any severable incriminatory parts qualify as declarations adverse to penal interest.

Presented in the context of a new trial motion, the defendant's other appellate challenge is that his trial counsel rendered ineffective assistance in not seeking to introduce as within other hearsay exceptions a number of out-of-court statements of bystanders to the drive-by shooting, which statements the defendant contends were exculpatory. Presented in the direct appeal, the defendant's main appellate challenges relating to conduct of the trial concern an erroneously admitted, unsupported reference in the testimony of a State trooper to the effect that "many other people" had information that the defendant was involved in the shooting; and improper comments in the prosecutor's closing concerning gangs and the "law of the jungle," the prejudicial effect of which, it is claimed, was enduring, notwithstanding the judge's cautionary instructions to the

jury. We affirm the convictions and the denial of the new trial motion.

2. *Factual background.*[1] We recite those facts that are pertinent to the particular issue presented as taken from the trial evidence and from the trial judge's findings on the motion for new trial. On the afternoon of May 3, 1998, various members of a gang known as the Latin Kings were congregated at a street corner in Holyoke, when Frankie Santiago (Santiago), a member of the rival La Familia gang, stopped there for a traffic signal. Santiago, who was with his girlfriend and daughter, was driving a two-door white Toyota hatchback automobile, with tinted windows and a sunroof. Members of the Latin Kings began taunting Santiago about the recent murder of his cousin, Johnny Acevedo, a fellow La Familia gang member. Infuriated by the mocking of his cousin's death, Santiago returned to Springfield to report what had happened and to enlist members of the La Familia gang to return to Holyoke. One of the men Santiago solicited at the La Familia headquarters was the defendant, Carlos Marrero. The defendant got his gun. Then, with Santiago driving the white Toyota, the two left for Holyoke. As the Toyota approached the corner where the Latin Kings had previously congregated, the defendant stood up in the passenger seat, stuck his head and upper body through the sun roof, and began firing a revolver at the crowd. Two bystanders were wounded — a young woman was shot in the head and a man was shot in the leg. After the shooting, Santiago and the defendant returned to Springfield.

The police identified Santiago as involved in the shooting, and he was apprehended. Ultimately, Santiago agreed to cooperate with the government, identified the defendant as the shooter, and testified against him at trial. There was other corroborative evidence including but not limited to evidence that, while being held at the police station, the defendant was informed that Santiago had given statements implicating him, and, thereafter, the defendant made a self-incriminating call using a telephone in the police station. The call was overheard by Officer Lopez. Lo-

---

[1]For further factual background, see *Commonwealth* v. *Perez,* 437 Mass. 186, 187-189 (2002), the appeal of a codefendant in this case convicted of being an accessory after the fact.

pez testified that the defendant stated, "They got me by the balls," and that "Pirulo [Santiago] had ratted him out."

3. *The out-of-court bystander statements.* The essence of the defendant's ineffective assistance claim is that counsel should have sought to introduce seven out-of-court statements of bystander witnesses given to the police at various points in time before and after the shooting, which would have bolstered the defense by suggesting that there was another or third person in the Toyota close in time to the drive-by shooting. From there, it is theorized that the jury might have had some reasonable doubt concerning whether the defendant or this other person was the shooter.

a. *The declaration against penal interest exception.* The defendant claims that the statement given by one Carlos Lebron was exculpatory as to the defendant's involvement in the drive-by shooting (Lebron spoke of Santiago, "Shane," and a "black guy" as being in the car and placed a gun in Santiago's hand), and, because incriminating as to Lebron, was admissible as within the hearsay exception for statements against penal interest. In contrast to the other six out-of-court statements, which were patently beyond the claimed hearsay exceptions cited (see part b, *infra*), the evidentiary analysis in this instance is more nuanced because at least part of Lebron's narrative included self-incriminatory admissions that would qualify as declarations against penal interest.

We begin with the black letter evidentiary principle. "A statement is admissible under the penal interest exception if (1) the declarant's testimony is unavailable[2]; (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement, if offered to exculpate the accused, is corroborated by circumstances clearly indicating its trustworthiness." *Commonwealth* v. *Charles*, 428 Mass. 672, 677 (1999), citing *Commonwealth* v. *Drew*, 397 Mass. 65, 73 (1986). See Proposed Mass.R.Evid. 804(b)(3).

Lebron's statement, which, it is contended, falls within this

---

[2]The unavailability of the declarant was established. Lebron was wanted to answer other criminal charges, but had disappeared.

evidentiary rule, may be summarized as follows. Four days after the shooting, Lebron provided a statement to the police, to the effect that, on the day of the shooting, Lebron was "running dope" on Chestnut Street in Holyoke, when Santiago pulled up in a white Toyota Celica automobile with "Shane and some black guy." Santiago showed Lebron a silver gun. Some fifteen to twenty minutes thereafter, Lebron heard shots and ran to the scene of the shooting.

Viewed in partition, only that part of the statement about "running dope" incriminates Lebron, the declarant, and, therefore, falls within the definition of a declaration against penal interest. That the reference was a part of a longer narrative, describing his sighting of (i) the Toyota used in the drive-by shooting, and (ii) Santiago with a gun and two other men in the car, does not transform all of these references in the narrative into declarations against Lebron's penal interest. Rather, application of the evidentiary rule concerning declarations against penal interest to a full narrative requires breaking out which parts, if any, of the declaration are actually against the speaker's penal interest. Further, application of the hearsay exception requires determination whether the declaration has an evidentiary connection and linkage to the matters at hand in the trial.

This is the methodology followed by the United States Supreme Court in construing the analogous Federal evidentiary rule. See Fed.R.Evid. 804(b)(3). Our courts have often looked to the Federal courts' construction of the Federal rules of evidence. See *Commonwealth* v. *Carr*, 373 Mass. 617, 623-624 (1977); *Commonwealth* v. *Pope*, 397 Mass. 275, 279 (1986). We do so here in crafting the common-law standards for this evidentiary principle with respect to declarations against penal interest. In *Williamson* v. *United States*, 512 U.S. 594 (1994), the Court drew the precise dividing lines we endorse here: splitting the evidentiary qualification and admissibility of particular self-incriminatory statements (and any necessary surrounding context) that are directly against the declarant's penal interest

from the not directly incriminatory and broader narrative state-
ment in which the penal declaration is embedded.[3]

> "Rule 804(b)(3) is founded on the commonsense notion
> that reasonable people, even reasonable people who are
> not especially honest, tend not to make self-inculpatory
> statements unless they believe them to be true. This notion
> simply does not extend to the broader definition of
> 'statement.' The fact that a person is making a broadly
> self-inculpatory confession does not make more credible
> the confession's non-self-inculpatory parts. One of the
> most effective ways to lie is to mix falsehood with truth,
> especially truth that seems particularly persuasive because
> of its self-inculpatory nature. . . . In our view, the most
> faithful reading of Rule 804(b)(3) is that it does not allow
> admission of non-self-inculpatory statements, even if they
> are made within a broader narrative that is generally self-
> inculpatory. The [trial] court may not just assume for
> purposes of Rule 804(b)(3) that a statement is self-
> inculpatory because it is part of a fuller confession . . . ."

*Williamson* v. *United States*, 512 U.S. at 599-601.

Applying these principles leads to the conclusion that only
that small part of the statement in which Lebron implicated
himself in the crime of distribution of a controlled substance
was within the hearsay exception. However, this singular
incriminating declaration against penal interest did not act as a
magnet drawing to a hearsay-excepted polar field Lebron's ad-
ditional statements involving the car sighting, the men in it, and
Santiago's silver gun. The latter tag-along pieces remained rank
hearsay.[4] See *Commonwealth* v. *Lopera*, 42 Mass. App. Ct. 133,
137 (1997).

Given the inadmissibility of Lebron's narrative statement,
there was no ineffective assistance in defense counsel failing to

---

[3]This approach is consistent with the verbal "completeness rule" as applied
in our courts. See, e.g., *Commonwealth* v. *Watson*, 377 Mass. 814, 823-834
(1979), *S.C.*, 409 Mass. 110 (1991).

[4]The incriminatory drug-running reference — even if potentially admissible
as a declaration against Lebron's penal interest — was, nonetheless, exclud-
able on relevancy grounds because the declaration was not linked to the
charges at issue in the trial of the defendant.

move for its introduction. See *Commonwealth* v. *Shelton*, 37 Mass. App. Ct. 964, 966 (1994).

b. *Excited utterance and inconsistent statement theories of admissibility.* The remaining six out-of-court statements, which the defendant contends his counsel should have sought to introduce because references to another person in the car were potentially exculpatory — a point which is questionable[5] — do not, in light of settled principles of law, warrant extended analysis. In denying the new trial motion, the judge (who had been the trial judge) set forth a comprehensive and trenchant analysis of the reasons why these six out-of-court statements were hearsay and did not meet the elementary standards for the hearsay exceptions that the defendant advanced, i.e., did not qualify under either the excited utterance, see *Commonwealth* v. *Whelton*, 428 Mass. 24, 26-27 (1998), or the prior inconsistent statement hearsay exceptions, see *Commonwealth* v. *Daye*, 435 Mass. 463, 472 (2001).

Because all seven out-of-court statements were inadmissible as matter of the law of evidence, the defendant lost no substantial defense because of ineffective assistance of counsel. See *Commonwealth* v. *Shelton*, 37 Mass. App. Ct. at 966 ("it cannot reasonably be asserted that trial counsel was ineffective when he failed to pursue . . . matter[s] that w[ere] determined to be inadmissible").

4. *The trooper's statement.* The defendant's next claim of error relates to one statement by Trooper Loiselle. The defendant contends that the statement was incriminating by suggesting other corroboration existed and was not supported by the evidence offered at trial, and that his counsel was ineffective in not objecting and moving to strike it. The trooper's statement was as follows:

> "I told him [the defendant] that we had spoken to [Santiago] and [that Santiago] had given us information that he [Santiago] . . . was the driver of the car involved in the

---

[5]The fact that the case included a joint venture theory of proof undermines the defendant's claim that his lawyer's ineffectiveness caused a substantial risk of a miscarriage of justice. Under the joint venture theory, the defendant was implicated in the shooting, no matter whether he and Santiago were in the car alone, or whether another man was present.

shooting . . . . I then told him that many other people had given us information that he [the defendant] . . . was involved in the shooting . . . ."

In ruling on the new trial motion, the trial judge found that the reference to "many other people" was improper. However, the judge found that the erroneously admitted reference was fleeting and that, viewed in the context of this relatively lengthy trial, where the total evidence presented against the defendant was very powerful, the isolated reference did not pose a substantial risk of miscarriage of justice.

While we give deference to the judge's determination, especially where the judge ruling on the new trial motion also was the trial judge, we also heed our independent obligation to review the record and make an independent determination of whether there was error. Based on that review, we conclude that the trial judge's analysis was correct. There is little question that the trooper's reference was improper. However, we agree that the reference was fleeting and of minimal impact in the context of this lengthy trial, where the evidence of the defendant's guilt was strong. Trooper Loiselle was one of nineteen witnesses, and the improper reference consists of merely three transcript lines in a record consisting of eight volumes and over eight hundred pages. In conclusion, we are not persuaded that the result of the trial would have been different absent the trooper's erroneously admitted testimony. *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986).

5. *Prosecutor's closing argument.* The defendant alleges prosecutorial error in the following references in the prosecutor's closing:

"And you heard defense counsel talk about a rat, a snitch, an accomplice witness, someone who is the lowest form of life. Think about that. The lowest form of life is not a man who puts a bullet in a wom[a]n's head. *To the likes of the La Familia, the lowest form of life is a La Familia brother who comes into court and testifies about what he and his fellow gang members did.*

"Well, ladies and gentlemen, the law that applies in this courtroom is not the law of the La Familia, it is not the

*law of the jungle,* not the law that holds that a person who would tell the police what happened or testify in court is lower than a man who would put a bullet in a woman's head. The law that applies here is the law of the Commonwealth, and there is one word for that, it is civilization."

(Emphasis added.) There was no objection. Accordingly, we review to determine whether the remarks were error and, if so, whether there was a substantial risk of a miscarriage of justice.

The reference to warring gangs, the La Familia gang, and its unlawful acts of revenge was appropriate because the evidence in this case showed just that — a prior gang killing, mocking gang threats, and a gang retaliatory strike. In these respects, the witnesses spoke of the gang warfare and gang colors and representative symbols, and, in addition, police officers testified to their knowledge of the existence of the two gangs, the Latin Kings and La Familia. Thus, this is not a case where references to gang affiliation were unnecessary or irrelevant to the case being tried. See *Commonwealth* v. *Wolcott,* 28 Mass. App. Ct. 200, 209-210 (1990). Contrast *Commonwealth* v. *Smiley,* 431 Mass. 477, 482-484 (2000).

However, the extrapolation from gang-related evidence and gang acts of violence to a suggestion that gang members — which would include the defendant — lived by the "law of the jungle" moved over the edge. The trial judge criticized the remarks as crossing the line of acceptable advocacy. It is a criticism well taken in light of the provocative implication of the remarks.

In this case, however, the remarks were counterbalanced and neutralized by a series of limiting instructions given by the judge both throughout the course of the trial and at its close, to the effect that the defendant's affiliation with a gang could only be considered by the jury with respect to what may have motivated certain of the defendant's actions, and that gang affiliation could not be considered as evidence of guilt. In light of these cautionary instructions, as well as the heft of the evidence proving the defendant's guilt, the prosecutor's misstep did not

give rise to a substantial risk of a miscarriage of justice and no new trial is warranted.

*Judgments affirmed.*

*Denial of motion for new trial affirmed.*